# Exhibit A

**NEW YORK STATE SUPREME COURT**
**BRONX COUNTY**

------------------------------------------------------------ X

TICHAONA BROWN and TABRESE WRIGHT,    :
                                     :
                Plaintiffs,    :    Index No.:
                                     :
        v.    :
                                     :    **COMPLAINT**

TWENTY-FIRST CENTURY FOX, INC., FOX    :
NEWS NETWORK LLC, and JUDITH SLATER,    :
in her individual and professional capacities,    :    **Jury Trial Demanded**
                                     :
                Defendants.    :
                                     :

------------------------------------------------------------ X

       Plaintiffs Tichaona Brown and Tabrese Wright commence this action against Twenty-

First Century Fox, Inc., Fox News Network LLC (together, "Fox" or the "Company"), and Judith

Slater ("Slater") (collectively, "Defendants"), to seek redress for the appalling racial

discrimination which they suffered while employed by Fox, and hereby allege as follows:

## SUMMARY OF CLAIMS

       1.    As described herein, Plaintiffs and other dark-skinned employees suffered years-

long relentless racial animus at the hands of their white supervisor, Slater, an eighteen-year

employee and former Senior Vice President ("SVP") of Accounting and Controller of Fox.

Despite being well aware of Slater's racist conduct, executives at Fox did nothing to put an end

to it and intentionally turned a blind eye.  For years, Fox permitted Slater to subject Plaintiffs and

other dark-skinned employees to a racially hostile work environment without fear of punishment

or reprisal, and refused to terminate Slater for her conduct or, upon information and belief, even

reprimand her in anyway.

       2.    That all changed last week, when Plaintiffs' attorneys, Wigdor LLP, put Fox on

notice that Plaintiffs would not capitulate to Fox's demands and would be filing this lawsuit.

Fox's public relations machine went into full gear. In an effort to get out ahead of this lawsuit and pretend to care about the discriminatory conduct committed against Plaintiffs, upon information and belief, Fox leaked some of the allegations contained herein to the press. The leak was on a Friday, a day notoriously used to bury stories. Fox terminated Slater as well.

3.     To be clear, Ms. Slater was not terminated because she engaged in discriminatory conduct – Fox was willing to let her get away with that for years. Rather, Slater was terminated because Fox knew this would become a public matter and wanted to salvage its reputation.

4.     However, in statements reportedly made to the press, Fox admits the truth of the allegations made herein. Indeed, a Fox News Spokesperson issued a statement, saying that: "There is no place for abhorrent behavior like this at Fox News." See http://variety.com/2017/tv/news/fox-news-comptroller-judy-slater-1202016012/.

5.     Fox also stated that it took "appropriate action" in response to Plaintiffs complaints. However, the opposite has occurred. Days before this lawsuit was filed, and immediately after Fox learned that Plaintiffs would not settle on Fox's terms, Fox summarily fired Ms. Brown and demoted Ms. Wright. Fox even admitted that it demoted Ms. Wright because she brought this lawsuit, describing the reason for her "position change" as follows: "This lateral transfer is occurring so that she no longer has access to Fox News confidential information that she could use in her lawsuit."

6.     No one predicted the extent of the fallout after anchor Gretchen Carlson exposed the scathing gender abuse at Fox when she filed a lawsuit alleging that Roger Ailes ("Ailes"), the former Fox Chief Executive Officer, subjected her to a litany of sexually harassing comments and actions. Despite Ailes' denials, multiple women from Fox came forward with similar allegations of a boss who regularly demanded sexual favors from female staff, made sexually

charged and degrading comments with impunity, and did nothing to conceal his lewd behavior. To date, the stories of more than 25 women, whose professional interactions with Ailes spanned two decades, shockingly reveal that Ailes regularly used his position of power to threaten and control women in junior positions through sexual bullying.

7.     Now, the top-down racial harassment at Fox is exposed.  In fact, the racial animus permeated the most hallowed halls of 1211 Avenue of the Americas, including on the infamous second floor where Plaintiffs worked alongside Roger Ailes, William Shine, Neil Cavuto, Mark Krantz, Sharri Berg, Suzanne Scott, Brian Jones and now, Jack Abernathy.

8.     While Fox executives were busy either participating in or looking the other way at the barrage of sexist, demeaning conduct hurled at its female employees, these same executives allowed this repugnant racial discrimination to go unchecked.

9.     The severity and pervasiveness of the racism at Fox are such that, within the confines of this complaint, it is not possible to list each instance of bias that employees experienced.  However, as the conduct described herein makes clear, Ms. Brown, Ms. Wright and other similarly-situated employees of color, regularly and repeatedly were subjected to intolerable and outrageous racial discrimination.  The unlawful discriminatory statements and conduct engaged in by Slater, and ratified by Fox, include such appalling facts as the following:

- Slater ridiculed black employees by mocking stereotyped speech and complained, for example, that black employees mispronounce the words "mother," "father," "month" and "ask," by pronouncing the words as "muva," "fava," "monf," and "axe," and incredulously forced black employees to practice saying the words correctly in front of white employees.

- Slater openly claimed that the "Black Lives Matter" movement is extremely racist and wondered what would happen if there was a parallel "White Lives Matter" movement.

- Slater disparaged black men in particular.  For instance, when a video surfaced on the internet that depicted the black football player, Ray Rice, assaulting his

3

wife in the elevator, Slater said, "Why are all black men women-beaters?" In connection with the video, Slater brought up O.J. Simpson, Mike Tyson and Chris Brown as other examples of black male wife-beaters.

- Slater regularly talked about her fear that black people want to physically harm white people, Slater told employees that she does not travel north of 90th Street in Manhattan because she is afraid she will be "jumped" or "beat up." For safety reasons, Slater claims to travel there only when accompanied by a black person.

- Slater blatantly mocked the "Black Lives Matter" movement. After the August 2014 shooting of Mike Brown, and the onset of the "Hands Up, Don't Shoot" slogan, when Ms. Brown would stop by Slater's office to say good-bye at the end of the day, Slater responded by raising her hands up in the "Hands Up, Don't Shoot" movement.

- Slater regularly called her commuter train to New Jersey the "Bombay Express," due to the number of people of Indian descent who live in New Jersey.

- Slater openly talked about her belief that all Chinese men have "small penises."

- Slater called day laborers "cheap Mexicans."

- Due to the number of employees of color in the payroll department, Slater regularly called the payroll department, the "southern payroll department" and the "urban payroll department."

- Slater asked Ms. Brown and Ms. Wright to teach her how to "beat box."

- Knowing that Ms. Wright has three children, Slater incredulously asked her if all three children "were fathered by the same man."

10. These are only a tiny fraction of the discriminatory actions engaged in by Slater.

11. Slater's conduct and Fox's acquiescence to it should come as no surprise and is the natural result of an all-white executive team. Indeed, not a single one of Twenty First Century Fox, Inc.'s Executives are black, and there is only one black member of the board of directors. See https://www.21cf.com/management/executive-team;

https://www.21cf.com/management/board-of-directors.

4

12.     No employee should have to endure a workplace permeated with invidious discrimination. Nevertheless, like the other employees of color at Fox, Ms. Brown and Ms. Wright feared for their jobs if they dared complain about Slater. Such fears were reasonable given the knowledge and ratification of Slater's conduct by senior executives at Fox, including Denise Collins, the Senior Vice President of Human Resources ("HR"). Ms. Brown and Ms. Wright had nowhere to turn when the highest-level executive in HR, the one department where employees were supposed to be able to seek help from, participated in the discrimination with Slater.

13.     Over time, Ms. Brown and Ms. Wright watched other black employees who worked under Slater's supervision simply leave Fox rather than endure Slater's torment another day.

14.     No longer willing to remain silent while Fox treated employees of color as second-class citizens, Ms. Brown and Ms. Wright dared to speak out about the intolerable work environment, including their unequal pay and opportunities for advancement and development as compared to similarly-situated white employees. As stated above, the retaliation was swift and severe, as Ms. Brown was fired and Ms. Wright demoted.

15.     Flouting all responsibility to follow the laws designed to protect employees in these exact circumstances, Fox clearly sees itself as a company entitled to operate above and outside of the civil laws applicable to everyone else.

16.     As a result, Plaintiffs commence this action to seek declaratory, injunctive and equitable relief, and monetary damages, against Defendants for harm suffered as a direct result of their discrimination, harassment and retaliation, in violation of the New York State Human

5

Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

17.    At all times, Defendants' conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Ms. Brown and Ms. Wright's rights, warranting an award of punitive damages.  Such conduct has caused, and continues to cause, Ms. Brown and Ms. Wright to suffer substantial monetary damages and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

18.    The Court has personal jurisdiction over Defendants pursuant to Civil Practice Law and Rules ("CPLR") § 301 because Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC, both Delaware entities, are authorized to conduct business throughout New York, and have their principal place of business located at 1211 Avenue of the Americas, New York, NY.  At this same location, Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC employ hundreds of employees.  Moreover, Defendants employ hundreds more individuals throughout the state.

19.    At all relevant times, Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC continuously and systematically conducted business in New York.  Further, the events giving rise to this action took place at the principal offices for Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC, located at 1211 Avenue of the Americas, New York, NY.

20.    Defendant Judith Slater is a resident of the State of New Jersey.  Defendant Judith Slater has been employed at Fox as a Senior Vice President and Controller of the accounting division for more than eighteen years.  In this capacity, she supervises all employees in the payroll, accounting, and account receivables/payable departments, including Ms. Brown and Ms.

6

Case 1:17-cv-03017   Document 1-1   Filed 04/25/17   Page 8 of 30

Wright.  At all relevant times, Defendant Judith Slater conducted her work from the principal offices for Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC, located at 1211 Avenue of the Americas, New York, NY.

21.     Venue is proper pursuant to CPLR § 503 because Plaintiff Tabrese Wright resides in Bronx County.

### ADMINISTRATIVE PROCEDURES

22.     Plaintiffs will submit charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").

23.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

24.     Plaintiffs have complied with any and all other prerequisites to filing this action.

### PARTIES

25.     Plaintiff Tichaona Brown lives in Suffolk County, New York.  Ms. Brown was employed by Fox as a payroll manager.  At all relevant times, Ms. Brown met the definition of an "employee" under all applicable statutes.

26.     Plaintiff Tabrese Wright lives in Bronx County, New York.  Plaintiff is employed by Fox as a payroll Coordinator.  At all relevant times, Plaintiff Wright met the definition of an "employee" under all applicable statutes.

27.     Defendant Twenty-First Century Fox, Inc. is a corporation with its principal place of business in New York County, New York, and is duly organized and existing under and by

virtue of the laws of the State of Delaware. At all relevant times, Twenty-First Century Fox, Inc. has met the definition of an "employer" of Plaintiffs under all applicable statutes.

28.     Defendant Fox News Network LLC is a limited liability company with its principal place of business in New York County, New York, and is duly organized and existing under and by virtue of the laws of the State of Delaware. Fox News Network LLC is a wholly owned subsidiary of Twenty-First Century Fox, Inc. In turn, Fox News Network LLC owns Fox News Channel LLC ("FNC") and Fox Business Channel. At all relevant times, Fox News Network LLC has met the definition of an "employer" of Plaintiffs under all applicable statutes.

29.     Defendant Judith Slater is a resident of the State of New Jersey. Defendant Judith Slater has been employed at Fox as the Controller for eighteen years. In this capacity, Slater supervises all employees in the payroll, accounting and account receivables/payable departments, including Ms. Brown and Ms. Wright. At all relevant times, Defendant Judith Slater has met the definition of an "employer" of Plaintiffs under all applicable statutes.

## FACTUAL ALLEGATIONS

### Ms. Brown's Employment

30.     Ms. Brown began working for Fox in November 2008, when she was hired by Fox Interactive Media as a Human Resources Information Systems ("HRIS") employee and was assigned to work at MySpace, Inc., a social networking website located in Los Angeles, California that was owned by News Corporation.

31.     In December 2009, Ms. Brown was transferred to an HRIS position in 21st Century Fox Film Corp., and in July 2010, she was hired by Fox and was transferred to 1211 Avenue of the Americas where she worked in the payroll department.

8

32.     Payroll is part of the Administration Department ("administration") at Fox and, as such, Ms. Brown's desk is located on the same floor and in close proximity to senior executives in administration, including Roger Ailes (until his recent departure), William Shine, Jack Abernathy, Neil Cavuto, Mark Krantz, the former Chief Financial Officer ("CFO"), Sharri Berg, Suzanne Scott and Brian Jones.

33.     For the majority of her employment, Ms. Brown reported to the Director of Payroll, Natasha Beekharry, who in turn, reported to Slater.

34.     During her employment, Ms. Brown received outstanding performance evaluations and corresponding raises and bonuses.

35.     At all relevant times, the majority of employees who work in the payroll, accounts receivables and accounts payables departments are black individuals.  For example, in addition to Ms. Brown, Ms. Beekharry is black and current payroll employees Ms. Wright, Michelle Postley and Shelley Steele are black persons.  Presently, the only non-black employee in payroll is Pauline Acosta, the recently hired payroll director who earns significantly more than Ms. Brown.

36.     In contrast, the majority of employees in the accounting department are white. For example, the director of accounting, Tamela ("Tammy") Efinger is white, Christine Williams, a senior accountant, is white, Kerry Sikorski, the accounts manager, is white, and Kim Jacobson, a project manager, is white.  Collins, the SVP of HR, is also white.

**Slater Mocks Stereotyped Speech of Black Employees**

37.     In the presence of other employees, Slater complained to Ms. Brown that "her people" (black people) mispronounce the words "mother," "father," "month" and "ask," by saying, "muva," "fava," "monf," and "axe."

9

38.     For example, Slater told Ms. Brown that Mark Legrear, a black former employee who reported to Slater, always mispronounced such words and it would make Slater "cringe." Slater stated that she considered his speech especially inexcusable given his "lack of" a language barrier.

39.     As another example, during a meeting held in Slater's office, Slater wrote down five words on a yellow Post-it Note and forced Ms. Brown to say them aloud.  The five words were "ask," "father," "month," "mother," and "fifth."  This directive was meant to humiliate and disparage Ms. Brown, given that she was the only black employee in the meeting.  During this meeting, Slater also complained about other black women in her department, stating that Monica Douglas and Griselda Benson, like Mr. Legrear, consistently mispronounced certain words.

40.     On another recent occasion, Slater kept saying the word "monf" and directed her exaggerated annunciation of the word towards Ms. Brown.  Finally, Ms. Brown asked Slater why she kept saying the word "monf."   Slater responded in an unprofessional, vicious and inappropriate manner by saying, "I do the Journal Entries for Estimates every 'monf.'"  This condescending comment was meant to humiliate and embarrass Ms. Brown.  Moreover, the comment was made over the phone in the presence of Ms. Sikorski.

**Slater Says the "Black Lives Matter" Movement is "Racist"**

41.     Outrageously, at work, Slater regularly discusses a number of issues that are associated with black people and other minorities as being "racist."  For example, Slater opined that the "Black Lives Matter" movement is extremely racist.  In support of this belief, Slater claims that black people and minorities would strongly oppose a movement called "White Lives Matter."

42.     Similarly, Slater asked Ms. Brown whether she knows why a Black Entertainment Television ("BET") station exists and why it is necessary for a separate BET awards show. Slater stated that black people and minorities would be "up in arms" if a group of white people created a station called "WET."

43.     In support of her perceived unfairness towards white people, Slater pointed to the fact that Spanish-speaking individuals enjoy "Telemundo."

44.     Slater once asked Ms. Brown if she knew why there was no "White History Month," and complained that it was "not fair" that black people have "all of February" to celebrate "the blacks."

**Discriminatory Statements that Black Men are Wife-Beaters and Associated with Violence**

45.     Slater engaged in endless comments that disparaged black people generally and black men in particular.  For instance, when a video surfaced on the internet that depicted the black football player, Ray Rice, assaulting his wife in the elevator, Slater asked Ms. Brown, "Why are all black men women-beaters?"  Ms. Brown challenged Slater, complaining that it was entirely inappropriate to stereotype an entire race based on one instance.  Slater doubled down on her racist worldview, asking, "What about O.J. Simpson, Mike Tyson and Chris Brown?"

46.     Shockingly, Slater also referenced Ms. Beekharry's former husband, whom Slater claimed physically abused Ms. Beekharry.

47.     Due to her belief that black people want to physically harm white people, it was no secret in the office that Slater refused travel north of 90th Street in Manhattan unless she was accompanied by a black person.  Slater justified her decision based on her fear she will be "jumped" or beat up by a black person.

48.     One time when Slater was conveying such beliefs to Ms. Brown, Brian Jones, an

Executive Vice President, who is black and reports to Bill Shine, happened to walk by.  After

exclaiming that she hoped he did not hear, Slater made several remarks about Mr. Jones, meant

to disparage him, including: "He's more white than black," and "He loves the white women and

he's even married to a white woman."

49.      Disgustingly, Slater followed these comments by asking Ms. Brown, "How do

you feel about us white women taking all the good black men?" and "How does it feel when

black men want the Kardashians instead of you all?"

50.     On other occasions, Slater has expressed similar fears about being "robbed" or

harmed in Brooklyn by black people because she is white.  For example, after dropping a Fox

employee, Monica Douglas, off in Brooklyn, Slater told Ms. Brown that she "refused to make

eye contact with people in Brooklyn" because she did not want them attempting to rob her.

Slater told Ms. Brown that "They will see me and say look at this 'whitey,' … she probably has

some money, let's rob her."  Slater explained she was so afraid of this happening that she "looked

straight ahead" and made sure her doors were locked.

**Hands Up Don't Shoot**

51.     In a shocking and disturbing reflection of Slater's indisputable racial animus

towards black people, following the August 2014 shooting of Mike Brown, and the onset of the

"Hands Up, Don't Shoot" slogan in connection with the "Black Lives Matter" movement, Slater

mocked  the movement when Ms. Brown stopped by her office each evening to say good-bye.

52.     Employees such as Ms. Brown were required to stop by Slater's office on their

way out so she knew what time they left.  Specifically, after Ms. Brown bid Slater a good

evening, Slater responded by raising her hands up in the "Hands Up, Don't Shoot" movement as depicted in the photos below:

 

53.     Such conduct is reprehensible and legally actionable had Slater done this even on only one or two occasions.  However, Slater indulged herself in such bigotry that Ms. Brown is unable to quantify the numerous occasions on which she was subjected to such hideous abuse.

**<u>Ms. Brown is From the "Hood"</u>**

54.     There is no shortage of disgusting examples that show how often Slater seized on opportunities to insinuate that Ms. Brown is "lesser than" similarly-situated white employees. For example, Slater calls Central Islip, where Ms. Brown is from, the "hood."  In fact, after a meeting with Ms. Brown and Ms. Sikorski, Slater asked Ms. Sikorski if she would "ever go to the hood" and used an exaggerated pronunciation, "Hooood."  Sadly, Ms. Sikorski felt emboldened enough by Slater's actions to respond that she would not go there "because all they do is murder people and dump their bodies on the street."

55.     On a separate occasion, Slater condescendingly asked Ms. Brown if she wanted to be invited to Slater's friend's house in Smithtown/Hauppauge, so that she could experience what "a lily-white town" looks like.  Before Ms. Brown could muster a response to such an appalling statement, Slater dovetailed her bigoted comment by stating that if Ms. Brown did show up, Slater's friend would "probably lock the door and call security because she would be scared that

13

a black person is at her door." Slater ruminated aloud that her friend would probably never invite Slater back if she brought Ms. Brown to the house.

56.    After a discussion at work about a funeral for a co-worker's relative, Slater asked Ms. Brown "if people from Central Islip" bury bodies in their backyards.

57.    Slater also forwarded Ms. Brown a YouTube video of a black woman arguing with a white woman where the black woman punches the white woman and a physical fight ensues. Slater captioned the video, "Central Islip peeps?"

**Ms. Slater Designates Fox Executives Who Are "Down With The Blacks"**

58.    Outrageously, Slater believes it is necessary to classify which Fox executives have "issues" with black people. In this regard, Slater repeatedly uses the phrases "down with the blacks," or "not down with the blacks" to distinguish which executives may cause problems for black employees, including Ms. Brown. For example, Slater told Ms. Brown that Dianne Brandi is "down with blacks" because she had lived among "your people" in Barbados.

59.    Notwithstanding this claim, Slater also showed Ms. Brown an email thread from September 2012 written by Ms. Brandi that referred to Ms. Brown as an "idiot," in connection with a check that needed to be sent to Fox Contributor, Colonel Hunt. In this email, Ms. Brandi referred to Ms. Brown as a fictional employee, "Felicia from Finance." Slater corrected Ms. Brandi by writing back, "you mean, Tich from payroll," because there was no employee named "Felicia" who worked in finance.

60.    Another example showing that executives at Fox seemingly cannot differentiate between black female employees occurred last week when Jack Abernathy saw a black female temporary employee working in Ms. Brown's office and purportedly, began asking panicked

questions about why Ms. Brown was not out on leave. Because the temporary worker was black, Mr. Abernathy jumped to the conclusion that she was Ms. Brown.

61.  Slater also told Ms. Brown that Mark Krantz, the former CFO, would never give Ms. Brown any "trouble" because he was afraid of "black people."

62.  In connection with other Fox employees who may or may not be "down with the blacks," Slater also discussed Adam Horsley, a white Contributor married to a black woman, and Brian Jones, a black employee married to a white woman.

**Ms. Brown is Subjected to Persistent Racist Attacks by Slater**

63.  Among other disparagements focused on Ms. Brown's intellect and social standing, Slater has said the following:

- "You turned black like American southern blacks and act like a hoodlum;"

- After a co-worker thanked Ms. Brown for her help, Slater stated in a surprised tone, "Tich was able to actually help with something?;"

- Slater constantly referred to Ms. Brown and Ms. Wright as "dummy" and "numb nuts," and said they are "nice girls but dumb;"

- Slater regularly told Ms. Brown that her educational degrees are "useless," saying that "you have a bunch of useless degrees," even though Ms. Brown has a Bachelor's degree from State University of New York, Stony Brook, a Master's degree from Adelphi University, and credits toward a doctorate;

- Slater repeatedly and intentionally embarrassed and humiliated Ms. Brown in front of Ms. Jacobson, Ms. Efinger, and Ms. Sikorski, all white employees, in connection with Ms. Brown's purportedly inadequate excel skills, including by forcing her to try out "new excel formulas" in front of them that often resulted in their laughter and disparagement for Ms. Brown's "failures;"

- Slater often complained about Ms. Brown's Canadian citizenship and repeatedly asked her to obtain American citizenship, saying things such as, it bothers her that Ms. Brown "takes advantage of all of the opportunities and services offered to Americans without contributing;"

- Slater commented that Ms. Brown must make more money than any of her friends because they are black;

15

- Slater remarked that her tax money was probably supporting some of Ms. Brown's black friends who receive federal benefits; and

- Susan Lovallo, a white female and Supervisor of Travel, and Slater asked Ms. Brown if she knew why Michelle Obama "did not like whites," and whether Ms. Brown knew if it was because "Mrs. Obama was from the ghettos of Chicago" and believes that "white people have held her down over the years."

64.    Such shameful conduct continues through the present.  By way of example only, on January 25, 2017,  Slater called Ms. Brown and told her she had just come from the payroll office where saw Ms. Wright, Ms. Postley and Ms. Steele working and declared them a "**Southern** payroll department."

65.    As evident, it is simply not workable to list each racist and discriminatory statement to which Ms. Brown has been subjected, including many in the presence of top Fox executives.

66.    Unsurprisingly, Slater does not limit her racist statements to black people and has made outrageous and cruel statements in reference to other minorities.  By way of example only, included in such abhorrent conduct are:

- Slater's references to her daily commuting train as the "**Bombay Express,**" **due to the number of people of Indian descent** living in New Jersey;

- Slater's comments about **Chinese men having "small penises**;" and

- Slater's references to "**cheap Mexicans**."

**Ms. Brown's Employment Status**

67.    After Ms. Beekharry left Fox in May 2016, Ms. Brown assumed all of the former payroll director's responsibilities and workload but was not provided additional compensation or promoted.  Although Ms. Beekharry left in May 2016, Ms. Brown had assumed many of her duties months before her departure.

16

68.     Ms. Brown covered all such work until Ms. Acosta was hired and even then, Ms. Brown was responsible for training Ms. Acosta in her position as payroll director.

69.     Additionally, Ms. Brown was responsible for handling payroll on her own during Ms. Beekharry's two periods of maternity leave.

70.     Unfortunately, also in May 2016, Ms. Brown's mother suffered a stroke.  Because of this, Ms. Brown expressed her concerns to Slater that she may not be able to continue to work because she needed to care for her mother. Slater suggested a remote-work arrangement. Specifically, Slater asked Ms. Brown to commit to working remotely until December 31, 2016, to give Fox time to hire a new director of payroll and for Ms. Brown to train the new hire.  Ms. Brown agreed.

71.     Thereafter, in September 2016, Ms. Acosta was hired as payroll director and Ms. Brown began to train her in addition to managing the payroll department responsibilities.  Ms. Brown continued to work remotely.

72.     In or about November 2016, Slater asked Ms. Brown to remain working past December 31, 2016, to assist year-end processing and an upcoming project scheduled for 2017. Ms. Brown agreed.

73.     During the fall of 2016, however, aware that the administration department budgets for annual salary increases of 5% each July, Ms. Brown repeatedly asked for a performance review and salary increase.  Her last performance review was in July 2015, the last time she received a salary increase.

74.      Ms. Brown learned that Slater and Collins intended to deny Ms. Brown any raise at the same time that they approved raises for similarly-situated white employees, including Ms. Jacobson and Ms. Sikorski.  Moreover, despite the fact that Ms. Brown was tasked with training

Ms. Acosta, and that she previously was junior to and reported to Ms. Brown, Ms. Acosta is paid substantially more than Ms. Brown was paid.

75.     In or about January 2017, due to a planned upgrade of payroll software, Fox asked Ms. Brown to remain working until at least the end of April 2017.   Based on the projected deadlines for the software update, Ms. Brown expected to remain working remotely, on a fulltime basis, through August or September 2017.

**Retaliatory Firing After Protected Complaints**

76.     Ms. Brown's complaints about the racial discrimination she experienced and witnessed other employees experience are protected under state and city laws.

77.     Nevertheless, flouting all responsibility to follow the laws designed to protect persons of color in exactly such workplace circumstances, shortly after Ms. Brown raised her concerns to Fox about Slater, Collins and the ongoing discrimination, Fox informed her that she was terminated.

**Ms. Wright's Employment**

78.     Ms. Wright began working for Fox in August 2014, reporting to the 1211 Avenue of Americas location, where she is employed full-time as a "Payroll Coordinator."  Ms. Wright reports to Ms. Brown, who reports to Slater.

79.     Like Ms. Brown, Ms. Wright's desk is located on the same floor and in close proximity to senior executives in administration, including Roger Ailes (until his recent departure), William Shine, Jack Abernathy, Neil Cavuto, Mark Krantz, Sharri Berg, Suzanne Scott and Brian Jones.  In fact, when Ms. Wright looks out from her office, her view is directly into the offices of Ms. Shine and Mr. Abernathy.

18

Case 1:17-cv-03017   Document 1-1   Filed 04/25/17   Page 20 of 30

80.    At all times during her employment, Ms. Wright has worked in payroll and therefore under the ultimate supervision of Slater.

81.    Ms. Wright has and continues to experience appalling racial discrimination while employed at Fox, and was often present when Slater has engaged in racially charged conduct directed at Ms. Brown.

**Slater Mocks Stereotyped Speech of Black Employees**

82.    In the presence of Ms. Wright, and other employees, including Ms. Brown, Slater complained that black people mispronounce the words "mother," "father," "month" and "ask," by saying, "muva," "fava," "monf," and "axe."

83.    For example, in a meeting with other employees, Slater mocked Ms. Wright for purportedly announcing the word "month" as "monf." Disgustingly, Slater then called Ms. Wright her "**monf girl**."

84.    As another example, shortly after the meeting mentioned herein, Slater, still angry at Ms. Wright for her mispronunciation of the word "month," took a pile of folders filled with documents and directed that her "**monf girl**" scan and photocopy the documents, put them back in order and return to her.

85.    Such a task was far beneath Ms. Wright's usual responsibilities, and was assigned to intentionally humiliate and demean her. Slater's ugly bigotry was successful, as Ms. Wright broke down crying during the assignment as a result of her humiliation.

**Judgments on Intellect and Poor Character by Slater**

86.    It is well-known among employees that Slater considers Ms. Wright to be a poor performer and not smart. Slater's biased opinions are evident throughout many disparaging and demeaning comments made about Ms. Wright, both to her and to her employees about her. In

addition to the examples listed above in connection with Ms. Brown, many of which Ms. Wright

witnessed or was aware of taking place, are the following:

- Slater regularly refers to black payroll employees, including Ms. Wright, as the "**urban payroll department**;"

- Slater subjected Ms. Wright to an impromptu, self-made "accounting test," forcing her to try to answer questions about accounting tasks that Slater knew she had no experience working on, for the purpose of humiliating Ms. Wright, while at no time were similarly situated white employees subjected to such an impromptu test;

- Slater repeatedly demeaned and disparaged Ms. Wright about her low credit score, threatening Ms. Wright that she "better improve" her score "or else," and telling her that she was going to have to be counseled personally by Mr. Krantz;

- Slater discriminatorily discussed Ms. Wright's low credit score in the workplace, telling other employees about the "horrible" score and disparaging Ms. Wright's character; and

- At a recent meeting, while reviewing workflow within the payroll department, after Slater directed a question to Ms. Wright, who failed to answer fast enough, another employee answered the question, wherein Slater stated, "two years *here* (in reference to Ms. Wright) and just one month *here* (referring to the new employee)" implying in front of colleagues that Ms. Wright was "slow."

**<u>Ms. Wright is Subjected to Persistent Racist Attacks by Slater</u>**

87.    Among other disparagements towards Ms. Wright, Slater has made the following

outrageous comments, all with the intent to marginalize and demean Ms. Wright's social status

and confidence:

- Slater, knowing that Ms. Wright has three children, incredulously asked her if all three children "**were fathered by the same man**;"

- Slater regularly made disparaging comments about Ms. Wright's hair to employees in payroll, implying that Ms. Wright's hair was ethnic, "**too much afro**" and that she needed to "comb it before work;"

- Slater called Ms. Wright and Ms. Brown down to her office and asked the women if they knew how to "beat box," and if so, to please perform for her;

- After a work related lunch at the Olive Garden, Ms. Wright took home her uneaten food, and while riding the elevator, Slater inquired about Ms. Wright's "big bag," to which Ms. Wright said that she would probably bring the leftovers home to her three children.  The next day, Ms. Wright learned that Slater had made disparaging statements, including that Slater was "not paying for Ms. Wright's kids to eat."  Ms. Wright was so upset she considered offering to pay Slater the $11.00 for her portion of the lunch bill but feared further retaliation if she did so;

- One day, Slater walked into payroll, sat down, and forced Ms. Wright, Ms. Brown and the other employees to watch a YouTube video starring Leslie Jones, a black Saturday Night Live member, entitled "This Is How I Talk," claiming that Ms. Brown reminds her of Leslie Brown's character in the video[1]; and

- Ms. Wright also observed Slater hold her hands up to mock the "Hands Up, Don't Shoot" slogan in connection with the "Black Lives Matter" movement.

**Retaliation After Protected Complaints**

88.     After Ms. Wright dared speak up about the racial discrimination and refused to settle her claims on Fox's terms, Fox swiftly and ruthlessly retaliated.  On March 27, 2017, Fox informed Ms. Wright that she was being transferred out of the payroll department and into the role of Affiliate Accounts Receivable Coordinator, a position she has never held and that provides her with far fewer opportunities for advancement and development and not a compatible fit for her skills.

89.     On the same day, also in retaliation for complaining and refusing Fox's offer of settlement, Fox fired Ms. Brown.

---

[1]     https://www.youtube.com/watch?v=f8PXvqYpGCM.

## FOX WAS ON NOTICE OF RACIAL DISCRIMINATION

90.     Fox knew that other employees had complained about Slater and other supervisors at Fox in connection with racial discrimination.

**Natasha Beekharry**

91.     Ms. Beekharry was the Director of Payroll at Fox, who Ms. Brown reported to throughout her employment until May 2016 when Ms. Beekharry left Fox.  Ms. Wright also reported to Ms. Beekharry.  Ms. Beekharry worked directly under Slater.

92.     In or about August 2015, Fox was contacted by legal counsel for Ms. Beekharry to provide the Company with notice of the racial discrimination Slater engaged in.  Upon information and belief, Ms. Beekharry experienced much of the same conduct alleged herein on behalf of Ms. Brown and Ms. Wright.

93.     Ms. Beekharry departed from Fox in or about May 2016.

94.     Purportedly, as a result of Ms. Beekharry's claims, Fox agreed to send Slater to training/counseling sessions in connection with her anger and racial intolerance.

95.     Ms. Brown and Ms. Wright were present for the racial discrimination endured by Ms. Beekharry at the hands of Slater.

**Mark Legrear**

96.     Upon information and belief, Mark Legrear, also complained to HR and other Fox employees about Slater's racial discrimination.  Mr. Legrear, a black male and former Accounts Payable supervisor, told co-workers that he was "forced into early retirement because of Judy Slater."  Allegedly, Slater, along with Tamela Efinger, Director of Accounting, ridiculed and harassed Mr. Legrear on the basis of the color of his skin.

97.     Mr. Legrear complained that he could no longer tolerate Slater's racial animus.

98.     Moreover, at the time that Mr. Legrear exited Fox, Slater had refused to give him a review or salary increase for over three years.

**Harmeen S. Jones**

99.     Harmeen S. Jones, a former black employee at Fox, commenced an action for discrimination and retaliation under Section 1981 and Title VII against Fox in the United States District Court, Southern District of New York, Index No. 10 Civ. 7967 (PKC).

100.    In 2005, Jones was hired by Fox and worked in connection with the department responsible for organizing global "intake feeds" from Fox cameras all over the world. The room contained a wall of screens showing the feeds and rows of control stations facing the screens. According to his second amended complaint, Jones had to sit one row behind (about 5-6 feet) a co-worker named Damian Rodriguez ("Rodriguez"). Rodriguez purportedly engaged in an endless stream of racist statements each day, about blacks, Arabs, Muslims and women. Rodriguez made racist remarks about Jones, directly to him and in front of co-workers, and bullied and physically threatened him.

101.    Jones' complaint alleges that he could not report the discrimination to HR because the people in HR were friends with his supervisors and Rodriguez and nothing would be done.

102.    At some point in 2009, however, Jones finally reported the racial discrimination to Veracil Vega, the head of HR for News Corp. and to his supervisors. A meeting about the discrimination was held. Shortly thereafter, Jones was terminated.

103.    In connection with this action, Jones named two white male supervisors, William "Billy" Tote and Steve Carey.

104.    Ms. Brown knows of Billy Tote and Steve Carey because she sees them often fraternizing with Slater in Slater's office.  Upon information and belief, these two men are more than simply work associates with Slater, and the three are considered close friends.

**Wasim Rafik**

105.    Upon information and belief, another black payroll employee, Wasim Rafik, placed Fox on notice about Slater's discriminatory conduct.  Specifically, Mr. Rafik complained to Collins and to Ms. Brandi that Slater singled him out and subjected him to harassment based on his dark-skin, national origin and his religion, Muslim.

106.    Rather than addressing the ongoing issues with Slater, Fox knowingly chose to remove Mr. Rafik from Fox as quietly as possible.  On or about December 2016, Mr. Rafik left Fox.

107.    Despite Fox's awareness of Slater's bigotry and allegations of racial discrimination against other supervisors, it failed to take any action, thereby ratifying and fostering a culture of severe racial harassment.

**FIRST CAUSE OF ACTION**
**(Race, Ethnicity and National Origin Discrimination and**
**Hostile Work Environment in Violation of the NYSHRL)**
*Against All Defendants*

108.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

109.    Defendants have discriminated against Plaintiffs on the basis of their race, ethnicity and national origin in violation of the NYSHRL by, *inter alia*, equal terms and conditions of employment available to their similarly-situated white employees, including, but not limited to, subjecting Plaintiffs to racial slurs, racial bias, a hostile work environment and disparate treatment based on race, ethnicity and national origin.

24

110.    Defendants discriminated against Plaintiffs on the basis of their race, ethnicity and national origin in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination and harassment committed against Plaintiffs.

111.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, for which they are entitled to an award of damages.

112.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress, for which they are entitled to an award of damages.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendant Judith Slater*

113.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

114.    Defendant Slater knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiffs in violation of the NYSHRL.

115.    As a direct and proximate result, Plaintiffs have suffered and continue to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits, for which they are entitled to an award of monetary damages and other relief.

116.    As a direct and proximate result, Plaintiffs have suffered, and continue to suffer, emotional distress, for which they are entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Race, Ethnicity and National Origin Discrimination and Hostile Work Environment in Violation of the NYCHRL)
### *Against All Defendants*

117.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

118.    Defendants have discriminated against Plaintiffs on the basis of their race, ethnicity and national origin in violation of the NYCHRL by, *inter alia*, denying Plaintiffs equal terms and conditions of employment available to their similarly-situated white employees, including, but not limited to, subjecting Plaintiffs to racial slurs, racial bias, a hostile work environment and disparate treatment based on race, ethnicity and national origin.

119.    Defendants discriminated against Plaintiffs on the basis of their race, ethnicity and national origin in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination and harassment committed against Plaintiffs.

120.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, for which they are entitled to an award of damages.

121.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress, for which they are entitled to an award of damages.

122.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs are entitled to an award of punitive damages.

26

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL and NYCHRL)
### (*Against All Defendants*)

123.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

124.    By the actions detailed above, among others, Defendants have retaliated against Plaintiffs based on their protected activities in violation of the NYSHRL and the NYCHRL by, *inter alia*, terminating Ms. Brown shortly after her protected complaints were made to Fox, and by demoting Ms. Wright or otherwise transferring her to a lesser position or a position for which she has had no prior training on the same day that Ms. Brown was fired.  Such retaliation was inflicted subsequent to and in direct connection with their complaints of race discrimination

125.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL and the NYCHRL, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

126.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL and the NYCHRL, Plaintiffs have suffered, and continue to suffer emotional distress for which they are entitled to an award of compensatory damages.

127.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights under the NYSHRL and the NYCHRL, for which Plaintiffs are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State and City of New York;

B.      An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for all monetary and/or economic damages;

C.      An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.      An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment;

E.      An award of punitive damages;

F.      An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

28

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: March 28, 2017
       New York, New York

                                          Respectfully submitted,

                                          **WIGDOR LLP**

                                          By: _____
                                               Douglas H. Wigdor
                                               Jeanne M. Christensen
                                               Michael J. Willemin

                                          85 Fifth Avenue
                                          New York, NY  10003
                                          Telephone:  (212) 257-6800
                                          Facsimile:   (212) 257-6845
                                          dwigdor@wigdorlaw.com
                                          jchristensen@wigdorlaw.com
                                          mwillemin@wigdorlaw.com

                                          *Counsel for Plaintiffs*

29