**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

ADASA BLANCO and VIDYA MANN,

                          Plaintiffs        Civil Action No.: 17-cv-03017 (ALC)

        v.

                                                  **AMENDED COMPLAINT**

TWENTY-FIRST CENTURY FOX, INC., FOX NEWS NETWORK LLC, JUDITH SLATER, in her individual and professional capacities, and DIANNE BRANDI, in her individual and professional capacities and SUSAN LOVALLO, in her individual and professional capacities,

                                      **Jury Trial Demanded**

                        Defendants.

------------------------------------------------------------ X

Plaintiffs Adasa Blanco and Vidya Mann bring this Amended Complaint against Twenty-First Century Fox, Inc. ("21st Century Fox"), Fox News Network LLC ("Fox News," and, together with 21st Century Fox, "Fox" or the "Company"), Judith Slater ("Slater"), Dianne Brandi ("Brandi") and Susan Lovallo ("Lovallo") (collectively with Fox, "Defendants") and hereby allege as follows:

## SUMMARY OF THE CLAIMS

1. As described herein, Plaintiffs and other dark-skinned employees suffered years-long relentless racial animus at the hands of their White supervisor, Slater, an eighteen-year employee and former Senior Vice President ("SVP") of Accounting and Controller of Fox. Despite being well aware of Slater's racist conduct, executives at Fox did nothing to put an end to it and intentionally turned a blind eye. For years, Fox permitted Slater to subject Plaintiffs and other dark-skinned employees to a racially hostile work environment without fear of punishment or reprisal, and refused to terminate Slater for her conduct or, upon information and belief, even reprimand her in anyway.

2. That all changed in late March 2017, when Plaintiffs' attorneys, Wigdor LLP, put Fox on notice that Fox employees Tichaona Brown and Tabrese Wright intended to file a lawsuit against Fox in connection with Slater's hateful conduct.

3. Fox's public relations machine went into full gear. In an effort to get out ahead of this lawsuit and pretend to care about the discriminatory conduct committed against Ms. Brown, Ms. Wright and other Black employees, upon information and belief, Fox leaked some of the allegations contained herein to the press.

4. The leak was on March 24, 2017, a Friday, a day notoriously used to bury stories. Fox terminated Slater as well.

5. That day, immediately after Ms. Brown and Ms. Wright put Fox on notice that they were going to file a lawsuit, Fox, in a transparent attempt to avoid negative publicity and salvage its reputation, terminated Slater and issued the following statement:

> "We take any complaint of this nature very seriously and took the appropriate action in investigating and **firing Ms. Slater within two weeks of this being brought to our attention**."

See, e.g., http://variety.com/2017/tv/news/fox-news-comptroller-judy-slater-1202016012/.

6. Fox's claim is completely false. Slater was not terminated because she engaged in discriminatory conduct – Fox was willing to let her get away with that for years. Rather, Slater was terminated because Fox knew this would become a public matter and wanted to salvage its reputation.

7. Ms. Brown and Ms. Wright commenced their action against Fox on March 28, 2017, see Brown, *et al.* v. Twenty First Century Fox, Inc., *et al.*, Index No. 22446/2017E (Bronx County) (the "Brown Action"), attached hereto as Exhibit A. Less than one week later, the complaint was amended to add Fox employee Monica Douglas, who also alleged that she was

subjected to a racially hostile work environment at Fox.  See Brown Action, Dkt. No. 5, attached hereto as Exhibit B.

8. As evidenced by the facts regarding Ms. Douglas, in mid-2015, Brandi contacted her regarding a complaint about Slater that she had received from the former Director of Payroll, Natasha Beekharry.  In response to Brandi's inquiry, Ms. Douglas again complained about Slater's discriminatory conduct and again, nothing was done.  Instead, according to Ms. Douglas, Brandi declared that (despite the overwhelming evidence to the contrary, and without conducting any investigation) she did not believe Slater to be racist.  According to Ms. Douglas, Brandi said:

> **"Slater will not be fired because she knows too much," referring to Slater's knowledge regarding improprieties committed by former Fox News CEO Roger Ailes and former Fox News CFO Mark Kranz.**

9. Ms. Blanco's facts are shockingly similar but reveal an even more egregious truth. Fox knew that employees had complained about Slater's race discrimination more than **eight years ago** – yet no action was taken.  Detailed below, Ms. Blanco reported the racially hostile work environment to Brandi, Fox News's Executive Vice President, Legal and Business Affairs, as early as September 2008 – **eight and a half years before Slater was terminated**.

10. On another occasion, Ms. Blanco complained about racially discriminatory conduct committed by Slater and Lovallo to Denise Collins ("Collins"), Fox News's Head of Human Resources ("HR"), in October of 2012 – **nearly four and a half years before Slater was terminated**.

11. Simply put, Fox knowingly harbored and protected a racist employee, Slater, for more than eight years and then feigned and mispresented to the media and public that it terminated her immediately upon learning that she engaged in discriminatory conduct.

**JURISDICTION AND VENUE**

12.     Plaintiffs bring this action to seek monetary, declaratory and injunctive relief under 42 U.S.C. § 1981 ("Section 1981").

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

15.     Plaintiff Adasa Blanco lives in Bronx County, New York. Ms. Blanco was employed by Fox as a senior disbursement coordinator in Fox News's Accounts Payable Department. At all relevant times, Ms. Blanco met the definition of an "employee" under all applicable statutes.

16.     Plaintiff Vidya Mann lives in the State of New York. Ms. Mann was employed as an Accounts Receivables ("AR") Specialist at Fox. At all relevant times, Ms. Mann has met the definition of an "employee" under all applicable statutes.

17.     Defendant Twenty-First Century Fox, Inc. is a corporation with its principal place of business in New York County, New York, and is duly organized and existing under and by virtue of the laws of the State of Delaware. At all relevant times, Twenty-First Century Fox, Inc. has met the definition of an "employer" of Ms. Blanco under all applicable statutes.

18.     Defendant Fox News Network LLC is a limited liability company with its principal place of business in New York County, New York, and is duly organized and existing

under and by virtue of the laws of the State of Delaware. Fox News Network LLC is a wholly owned subsidiary of Twenty-First Century Fox, Inc. In turn, Fox News Network LLC owns Fox News Channel LLC and Fox Business Channel. At all relevant times, Fox News Network LLC has met the definition of an "employer" of Ms. Blanco under all applicable statutes.

19. Defendant Judith Slater is a resident of the State of New Jersey. Defendant Judith Slater was employed at Fox as its Controller for eighteen years, until March 2017. In this capacity, she supervised all employees in the Payroll, Accounting and Accounts Receivable/Payable Departments, including Ms. Blanco. At all relevant times, Defendant Judith Slater met the definition of an "employer" of Ms. Blanco under all applicable statutes.

20. Defendant Dianne Brandi resides in New York County, New York. Defendant Brandi is employed at Fox as the Executive Vice President, Legal and Business Affairs. Defendant Brandi has served as in-house counsel for Fox for over twenty years. In this capacity, she oversees multiple departments and other executives. At all relevant times, Defendant Brandi has met the definition of an "employer" of Ms. Blanco under all applicable statutes.

21. Defendant Susan Lovallo resides in Putnam County, New York. At all relevant times, Defendant Lovallo has met the definition of an "employer" of Ms. Blanco under all applicable statutes.

## FACTUAL ALLEGATIONS

I. **MS. BLANCO**

   A. **MS. BLANCO IS SUBJECTED TO SEVERE AND PERVASIVE DISCRIMINATION**

22. Ms. Blanco began working for Fox in December 2005, when she was hired as an Accounts Payable Specialist in Fox's Accounts Payable Department. Ms. Blanco worked in the Accounts Payable Department until her constructive discharge in August 2013.

23. The Accounts Payable Department is part of the Administration Department ("Administration") at Fox and, as such, at the start of Ms. Blanco's employment her desk was located on the same floor and in close proximity to senior executives in Administration, including the late Roger Ailes ("Ailes"), former Fox News co-President Bill Shine, Neil Cavuto, former Chief Financial Officer Mark Kranz, Sharri Berg, Suzanne Scott and Brian Jones.

24. Ms. Blanco reported directly to Mark LeGrier, the supervisor in Accounts Payable. Mr. LeGrier, in turn, reported to Slater.

25. From the beginning of her employment through May 14, 2013, her last day in the office, Ms. Blanco was subjected to a continuous stream of severe and pervasive discriminatory conduct at the hands of Slater and Lovallo.

26. By way of example only, Slater constantly mocked Ms. Blanco because, given that she is Puerto Rican and Hispanic, she has an accent. In particularly, Slater routinely made fun of Ms. Blanco for rolling her "Rs" when she spoke.

27. Slater also spent significant time forcing Ms. Blanco to repeat words such as "three" and "through," and chastising Ms. Blanco if she rolled her "Rs" while doing so. Slater would often make fun of Ms. Blanco's accent and say, "repeat after me," after which she would force Ms. Blaco to repeat a word Slater believed she mispronounced. Slater engaged in this cruel and discriminatory behavior solely because of Ms. Blanco's race and ethnicity.

28. Slater also regularly referred to the Payroll Department as her "urban" Payroll Department due to the number of minorities in the department.

29. Slater also stated that she did not like to travel uptown to neighborhoods with high minority populations because she did not "want to get jumped." Similarly, Slater referred to any areas with a high percentage of minorities as "the hood." Of course, as a minority herself, this

6

comment was highly offensive to Ms. Blanco, as it insinuated that minorities are violent and dangerous people by nature.

30. Slater made similar discriminatory comments in Ms. Blanco's presence with regard to other minorities, including other Hispanics. By way of example only, Slater repeatedly insulted Ms. Douglas for having an accent because she is Panamanian by making comments such as, "huh, what did you say? I can't understand that Panamanian accent," or "I can't understand you people's accent." When Ms. Douglas took offense to these comments, Slater would respond by telling Ms. Douglas that Panamanians were "too sensitive."

31. Slater would also threaten physical violence against minorities in an effort to "keep them in line" and prevent complaints about her conduct. By way of example, Slater often threatened to punch minority employees in the head. She did not threaten to commit physical violence against White employees.

32. Slater also got physical with Ms. Douglas, including throwing rolled up balls of paper at Ms. Douglas in front of her colleagues. According to the amended complaint in the Brown Action, Slater even "kicked Ms. Douglas in the buttocks" and "mockingly rubbed Ms. Douglas's hair in order to feel it's 'texture.'"

33. Slater also insulted Credit and Collections Manager Vielka Rojas, who is also Panamanian. By way of example, on one occasion she openly stated in a demeaning manner that Ms. Rojas was "cleaning like a Panamanian," when Ms. Rojas was wiping down her desk. This was extremely offensive and a play on the discriminatory stereotype that all Hispanic women are housecleaners.

34. Slater also regularly insulted Panamanian culture and people generally, including by stating that she would not even let her dog eat Panamanian food and that Panamanians eat

7

what White people throw in the garbage. As another example, Slater regularly stated that "all Panamanians are crazy."

35. The comments were particularly offensive to Ms. Blanco not only because they targeted Hispanics, but also because her adopted father is Panamanian and her siblings are all half-Panamanian.

36. Slater also regularly made fun of Black employees for their purported inability to pronounce words such as "mother," "father," "month" and "ask." Slater – who repeatedly claimed that Black individuals could only manage mispronunciations such as "muva," "fava," "monf" and "axe" – often demanded that Black employees, including Ms. Brown, Mr. Wright and Ms. Douglas, practice pronouncing these words in front of their colleagues. Slater did the same to Ms. Blanco, forcing her in open meetings to repeat words and chastising her for rolling her "Rs."

37. Lovallo also participated in the discriminatory conduct committed against Ms. Blanco. Indeed, Lovallo, who lives in Brewster, New York, complained to Ms. Blanco and others that she was "sick of seeing" all of the Latinos who had recently moved into Brewster.

38. In addition to all of the aforementioned discriminatory comments – and many others – Slater and Lovallo constantly yelled and screamed at, demeaned, belittled, micromanaged and criticized Fox's minority employees. Slater also degraded Ms. Blanco and other minority employees by insinuating or telling them that they were useless. This conduct, which occurred on a daily basis and was directed only at minority employees, contributed to the hostile work environment to which Ms. Blanco was subjected.

39. Slater also routinely threatened Fox's minority employees, telling them repeatedly that their jobs could be "outsourced at any minute" in order to prevent them from complaining about her discriminatory conduct.

### B.  MS. BLANCO PUTS FOX ON NOTICE OF THE DISCRIMINATION: FOX DOES NOTHING

40. Ms. Blanco put Fox News on notice of the discriminatory conduct committed by Slater as early as September 2008, when she reported Slater's discriminatory comments and conduct to Brandi. Indeed, Ms. Blanco explicitly told Brandi that Slater "makes discriminatory comments all the time, but nothing is ever done so what is the point in reporting it." Consistent with Fox's practice up to that point, Brandi did not even *ask* Ms. Blanco for examples or the details of the discriminatory conduct reported by Ms. Blanco. Upon information and belief, nothing was done to investigate Slater's racially discriminatory conduct. The conduct continued.

41. In October 2012, again, Ms. Blanco reported Slater's and Lovallo's discriminatory conduct. This time, she reported it to Collins. Although Collins said that she would investigate the matter, upon information and belief she never did. Collins failed to follow-up with Ms. Blanco and the discrimination did not cease or even slow.

### C.  MS. BLANCO IS CONSTRUCTIVELY DISCHARGED

42. In late-2012, Ms. Blanco learned that she was pregnant and due in July 2013.

43. In May 2013, due, upon information and belief, to the stress Ms. Blanco experienced as a result of the discrimination to which she was subjected, Ms. Blanco experienced extremely painful contractions and was rushed to the hospital.

44. Ms. Blanco's doctors put her on bedrest, and her baby was prematurely born the following month. Following the birth of her son, Ms. Blanco remained on leave.

45. Ultimately, knowing that she would be subjected to continuing racial harassment and an unbearable hostile work environment, and that her late-2012 complaints to Brandi went completely ignored, Ms. Blanco was unable to return to work. Under the circumstances, any reasonable person simply would not have been able to return to work. As such, Ms. Blanco was constructively discharged.

### II. MS. MANN

46. Ms. Mann is brown-skinned and Guyanese.

47. In April 2009, Ms. Mann was hired by Fox to work as an AR Specialist at Fox's headquarters located at 1211 Avenue of the Americas for four weeks to cover for Mauretta Thomas, who was out on maternity leave. In her position as an AR Specialist, Ms. Mann reported to Monica Douglas, the manager of the Credit and Collections Department. When Ms. Thomas returned from maternity leave, Ms. Douglas asked Ms. Mann to return to fill a more regular position.

48. At all relevant times, Ms. Douglas reported to Slater.

49. During her more than four years of employment, Ms. Mann's desk was located on the Sixteenth Floor of Fox's headquarters. However, on an almost daily basis, Ms. Mann and other employees in Accounts Receivable/Payable and Collections Department, had to visit the Second Floor to meet personally with Slater, Tamera Efinger or Payroll employees.

50. Located on the Second Floor were the offices of Fox senior executives, including Ailes, former Fox News co-President Bill Shine, Neil Cavuto, former Chief Financial Officer Mark Kranz, Sharri Berg, Suzanne Scott and Brian Jones.

51. In 2009, Ms. Mann obtained her employment at Fox through an agency. As such, Ms. Mann was not classified by Fox as a "permanent" employee, despite the fact that Ms. Mann worked in exactly the same positions, and performed the same work, as other employees in AR.

52. At all relevant times, Ms. Mann never received health insurance or other benefits associated with "permanent" employees from Fox.

53. After two years of fulltime work, Ms. Mann asked Ms. Douglas again, if she could be considered a permanent Fox employee. Ms. Douglas, recognizing Ms. Mann's hard work and dedication, told her to update her resume and said that she would submit to it Slater.

54. Thereafter, Ms. Douglas gave Slater Ms. Mann's resume and recommended her for a permanent position. Slater denied the request.

55. Slater thereafter hired a young, White female as an intern in the accounting department. After several months as an intern, Slater offered this young White woman a job as a permanent full-time employee.

56. Ms. Mann raised this fact to Ms. Douglas but understood that Ms. Douglas was subject to Slater's mandates and powerless to do more for Ms. Mann.

57. Subsequently, Ms. Mann's responsibilities continued to increase within AR.

58. Ms. Mann requested her status be upgraded several more times to no avail.

59. In later 2012, Ms. Mann became pregnant. Still without medical insurance from Fox, Ms. Mann pleaded with Ms. Douglas to say something again to Slater. Slater simply said to "hang in there."

60. Ms. Mann worked until the last possible day she could physically withstand full-time work before giving birth. At some point in in June 2013, Ms. Mann had to stop reporting to the AR Department for work. Thereafter, she gave birth to her child.

61. Sadly, Fox used this opportunity to terminate Ms. Mann and avoid paying her any insurance or extra compensation.

62. Upon information and belief, shortly after Ms. Mann gave birth, Slater hired another individual to work full-time as a "permanent" employee to perform Ms. Mann's responsibilities.

63. Because her desk was situated outside of Ms. Douglas's office and alongside other employees in Accounts Receivable/Payable and Collections, including Ms. Thomas and Claudine McLeod, both persons of color, Ms. Mann was present and heard Slater's racist vitriol inflicted on other Black employees under Slater's control, including, by way of example only, the following:

- Slater's disparaging remarks about "You Panamanians;"
- Disparaging and racially motivated comments about "Panamanian" food being disgusting and foul;
- Slater's insults to Ms. Douglas directly about her heritage (Panama);
- Slater's open ridicule of black employees' "accents" and Slater's belief that black employees could not properly pronounce certain words the way "white people" pronounce them; and
- Heard Slater regularly mock Ms. Douglas for her breast cancer and ongoing treatment.

64. Additionally, Ms. Mann was present when other Fox employees openly discussed the situation when Musfiq Rahman, a dark-skinned Bangladeshi employee, inadvertently walked into Ailes's office and Ailes subsequently had a wall built in front of his office to prevent minorities from mistakenly entering. Specifically, Ms. Mann heard that Ailes and others believed that Mr. Rahman was a "terrorist."

65. Ms. Mann knew that as a result of Mr. Rahman's conduct, many of the dark-skinned employees were told to access the Second Floor through a special door farther down the hall from Ailes's office.

**III.  FOX'S CLAIM THAT IT FIRED SLATER WHEN IT LEARNED OF HER CONDUCT IS FALSE**

66.  Both before and after Ms. Brown and Ms. Wright filed their lawsuit against Defendants, Fox publicly stated that it took "appropriate action" in dealing with Slater, and insinuated that it did not know about her unlawful conduct until after Ms. Brown and Ms. Wright had complained.  Indeed, Fox issued the following statement on March 24, 2017:

> "We take any complaint of this nature very seriously and took the appropriate action in investigating and *firing Ms. Slater within two weeks of this being brought to our attention*."

See, e.g., http://variety.com/2017/tv/news/fox-news-comptroller-judy-slater-1202016012/

67.  Fox's claim is completely false.  Indeed, as explained above, Fox was on notice of Slater's discriminatory conduct as early as September 2008 – ***eight and a half years before Slater was terminated***.

*68.*  Ms. Blanco again put Fox on notice of Slater and Lovallo's discriminatory conduct in October 2012 – ***nearly four and a half years before Fox fired Slater***.

**IV.  FURTHER EVIDENCE THAT FOX WAS ON NOTICE OF RACIAL DISCRIMINATION**

69.  According to Ms. Brown, Ms. Wright and Ms. Douglas, Fox knew that other employees had complained about Slater and other supervisors at Fox in connection with racial discrimination.

### Monica Douglas

70.  Ms. Douglas alleges that she complained about Slater's discriminatory conduct numerous times to Brandi.  Ms. Douglas alleges that, more than two years ago, on November 10, 2014, at 1:00 p.m., Ms. Douglas complained to Brandi about the racial discrimination committed by Slater.  According to Ms. Douglas, nothing was done to remedy the problem, and the

discrimination continued until Ms. Slater was terminated in March 2017, immediately after Fox learned that Ms. Brown and Ms. Wright would be suing Fox.

71. Also according to Ms. Douglas, in mid-2015, Brandi contacted Ms. Douglas regarding a complaint about Slater that she had received from the former Director of Payroll, Natasha Beekharry. In response to Brandi's inquiry, Ms. Douglas alleges that she again complained about Slater's discriminatory conduct and that, again, nothing was done. Instead, according to Ms. Douglas, Brandi declared that (despite the overwhelming evidence to the contrary, and without conducting any investigation) she did not believe Slater to be racist. According to Ms. Douglas, Brandi said:

> **"Slater will not be fired because she knows too much," referring to Slater's knowledge regarding improprieties committed by former Fox News CEO Roger Ailes and former Fox News CFO Mark Kranz.**

### Natasha Beekharry

72. Ms. Beekharry was the Director of Payroll at Fox, who, according to Ms. Brown, Ms. Brown reported to throughout her employment until May 2016 when Ms. Beekharry left Fox. According to Ms. Wright, she also reported to Ms. Beekharry. Ms. Beekharry worked directly under Slater.

73. According to Ms. Brown, Ms. Wright and Ms. Douglas, in or about August 2015, Fox was contacted by legal counsel for Ms. Beekharry to provide the Company with notice of the racial discrimination Slater engaged in.

74. According to Ms. Brown, Ms. Wright and Ms. Douglas, Ms. Beekharry departed from Fox in or about May 2016.

### Mark LeGrier

75.     Upon information (including the Brown Action) and belief, Mr. LeGrier, also complained to HR and other Fox employees about Slater's racial discrimination.  Mr. LeGrier, a Black male and former Accounts Payable supervisor, told co-workers that he was "forced into early retirement because of Judy Slater."  Slater, along with Tamela Efinger, Director of Accounting, ridiculed and harassed Mr. LeGrier on the basis of the color of his skin.

76.     Mr. LeGrier complained that he could no longer tolerate Slater's racial animus.

77.     Moreover, at the time that Mr. LeGrier exited Fox, Slater had refused to give him a review or salary increase for over three years.

### Harmeen S. Jones

78.     Harmeen S. Jones, a former Black employee at Fox, commenced an action for discrimination and retaliation under Section 1981 and Title VII against Fox in the United States District Court, Southern District of New York, Index No. 10 Civ. 7967 (PKC).

79.     In 2005, Mr. Jones was hired by Fox and worked in connection with the department responsible for organizing global "intake feeds" from Fox cameras all over the world.  The room contained a wall of screens showing the feeds and rows of control stations facing the screens. According to his second amended complaint, Jones had to sit one row behind (about 5-6 feet) a co-worker named Damian Rodriguez ("Rodriguez").  Rodriguez purportedly engaged in an endless stream of racist statements each day, about Blacks, Arabs, Muslims and women.  Rodriguez made racist remarks about Mr. Jones, directly to him and in front of co-workers, and bullied and physically threatened him.

80. Mr. Jones's complaint alleges that he could not report the discrimination to HR because the people in HR were friends with his supervisors and Rodriguez and nothing would be done.

81. At some point in 2009, however, Mr. Jones finally reported the racial discrimination to Veracil Vega, the head of HR for News Corp. and to his supervisors. A meeting about the discrimination was held. Shortly thereafter, Mr. Jones was terminated.

82. In connection with this action, Mr. Jones named two White male supervisors, William "Billy" Tote and Steve Carey.

83. According to Ms. Brown, Billy Tote and Steve Carey often fraternized with Slater in Slater's office.

### Wasim Rafick

84. According to the Brown Action, Wasim Rafik, another minority employee reporting up to Slater, complained to Collins about Slater's discriminatory conduct.

85. According to the Brown Action, rather than addressing the ongoing issues with Slater, Fox knowingly chose to remove Mr. Rafik from Fox as quietly as possible. According to the Brown Action, Mr. Rafik left Fox in or around December 2016.

### FIRST CAUSE OF ACTION
(Discrimination in Violation of the Section 1981)
*Against All Defendants*

86. Plaintiffs hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

87. As described above, Defendants have discriminated against Plaintiffs on the basis of their race and/or ethnicity in violation of Section 1981 by, *inter alia*, (i) fostering, condoning,

accepting, ratifying and/or otherwise failing to prevent or remedy a racially hostile work environment; and (ii) constructively discharging Plaintiffs.

88. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

89. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
**(Retaliation in Violation of the Section 1981)**
*Against All Defendants*

90. Plaintiff Blanco hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

91. As described above, Defendants have retaliated against Plaintiff Blanco on the basis of her protected activities in violation of Section 1981 by, *inter alia*, ignoring her protected complaints about the discrimination she was subjected to, including relating to racial harassment and discrimination she was subject to after, and in direct connection with, her protected complaints. By their retaliatory actions, Defendants continued to foster a racially hostile work environment and engaged in conduct that led to her constructively discharging her.

92. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff Blanco has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages.

93. Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff Blanco is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with Defendants, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F. An award of punitive damages, and any applicable penalties;

G. Prejudgment interest on all amounts due;

H. An award of costs that Plaintiffs incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

I. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 22, 2017
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _/s/ Jeanne Christensen_
    Douglas H. Wigdor
    Jeanne M. Christensen
    Michael J. Willemin

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@wigdorlaw.com
jchristensen@wigdorlaw.com
mwillemin@wigdorlaw.com

*Attorneys for Plaintiffs*